Well, the next final matter for the day, which is almost deja vu all over again, the Constitution Party of Pennsylvania, Green Party v. Cortes and the Larks. Mr. Hall Good morning, Oliver Hall, on behalf of the plaintiff appellants. This appeal arises in somewhat unusual circumstances in that my clients prevailed in the proceedings below. Our motion for permanent injunction was granted, and yet we still find it necessary to lodge this appeal. Mr. Hall, let me begin with a predicate question that I raise because I don't understand what I think is an argument of yours, and it is that the district court lacked jurisdiction to implement the remedy that it did. How is that a jurisdictional matter? You're not contending that there was a lack of subject matter jurisdiction here, are you? Mr. Hall We are, Your Honor, and that's because, as the court is well aware, federal courts are courts of limited jurisdiction. The district court, in this case, exercised federal question jurisdiction over the claims that we asserted in the complaint. Mr. Allen Isn't your challenge merely to the form of relief that's granted, the remedy that the district court chose? Mr. Hall Your Honor, that's the way the commonwealth would like to characterize it, but the fact  Mr. Allen How else can you characterize it? Mr. Hall Well, fair enough, Your Honor, but the fact is that what the district court did here was impose entirely new substantive requirements on these parties. Mr. Allen A merits argument, right? An assertion that he made a mistake, not a statement that he didn't have jurisdiction. Well, I shouldn't ascribe anything to Chief Judge Smith, but I was certainly puzzled by your response. Mr. Smith Well, I've heard this before, Judge. Mr. Allen Yeah, I don't know why you wanted to invest in that argument. It doesn't seem to make a lot of sense to me. Your complaint is he shouldn't have done it. That's a classic merits argument, not he couldn't have done it. Mr. Hall Well, the point here, Your Honor, is that a federal question jurisdiction is limited to the questions actually raised in a case. The question of county-based distribution requirements was never raised in this case. As this court has recognized, that issue, in order to be part of this case, must be apparent on the face of the complaint. It's not raised in the complaint. It wasn't mentioned in any of the briefing papers. Mr. Allen You sought relief, so clearly you're unhappy with the relief. One thing that struck me is, in the motion for preliminary injunction, or temporary restraining or permanent injunction, you said that, and I think this is, I'm quoting this accurate, that, in the alternative, the minor parties request that the court direct Secretary Cortez to place their candidates on the November 8, 2016, general election ballot, provided that they submit nomination papers on or before August 1, 2016 deadline with valid signatures of qualified electors, including non-members, equal in number to the requirements imposed upon major party candidates, close quote. Now those requirements imposed on major party candidates include the county distribution requirements, right? Well, your honor, I recognize that that language was perhaps imprecise, given the issue that's now being raised, but what we were asking there... Imprecise or not, I mean, whether you meant to say it or not, you told the court, in the alternative, we're ready to live by what the major parties live by, and the district court did something like that. Doesn't that put you in an odd position to complain at all, let alone to complain about lack of jurisdiction, let alone, let alone, to say it's sui sponte, since it's in your moving papers? Well, your honor, we did not ask the court to impose county-based distribution requirements, and to the extent... That's part of what the major party... We asked the court to impose the number of signatures, not the distribution requirement. The distribution requirement we have never addressed in this case, and it was never an Can you see how the judge might think when you said, quote, to the requirements imposed upon major party candidates, that you meant the requirements imposed on major party candidates, including county distribution. That's a reading that a fair-minded judge might have made. It is, your honor. I can see that point. However, we did have hearings on this issue, and we strenuously objected both orally and in writing to the idea that the district court, as part of the so-called relief that it's granting in this case, should be imposing unconstitutional county-based distribution requirements. We didn't ask for that. To the extent that the motion that we filed could be read to or could be construed as requesting that, we certainly made clear that was not our intention, and it's very obvious why it's not our intention. These requirements are unconstitutional, and perhaps if the court is not convinced by the jurisdictional argument, we ought to move to the merits. Let's do that. And turning to merits, I think it's abundantly clear from the briefing that these requirements are in fact unconstitutional. What about Zaltra? What about no appreciable impact? That's right, your honor. That is the one case that has found the opposite point of view. It's obviously the minority view, and in that case, the court relied on the fact that there were only 10 signatures required in 10 different counties, and it found, as your honor points out, a minimal burden on the candidate. Well, all the other cases, or at least most of the other cases that analyzed this issue, recognized that under Moore v. Ogilvie, the issue is not the burden that is imposed on the candidate, but the issue is the dilution of voting power. So are you then taking the position, because I thought you had disclaimed it in your reply brief, but it sounds like you may be going back to it, that the commonwealth said, you've taken the position that Moore v. Ogilvie says you can have no county distribution requirement at all, that that is per se unlawful and unconstitutional. You seem to back off of that in your reply brief. Are you going back to that and saying, any county distribution requirement is ipso facto unconstitutional? Well, is there a minimal burden standard here to be looked at? Judge Jordan, we don't make the argument that county-based distribution requirements are per se unconstitutional. All right, then if that's the case, you would have to concede, wouldn't you, that the district court's decree here was much less burdensome than what was the case in Moore? That may be the case, Your Honor, but again, burden is not the issue here. The burden on the candidate seeking ballot access is not the issue. The issue under Moore... Wait just a second, sir, because I thought we just had gotten to the point where that could be the issue. If it's not per se unconstitutional, then there's a point at which the burden is so minimal that it's not unconstitutional, then isn't the burden in fact the issue? You've got to show that this burden is more like the burden in Moore than it is like the burden in Zeltrow, that there's a scale and the district court judge here had pegged the spot in a place where the burden's intolerable. The point about whether it's per se unconstitutional or not is simply this. There may be a state, there is not in fact, but there could be a state in which counties, much like congressional districts, were equal in number based on population. There is no such state. So you are making a per se argument, right?  We go back and forth here. I'd like to land somewhere with some suggestion that permits it. I don't think the issue is whether we're making a per se argument or not. The fact is that the cases all hold because, with all respect, that is a threshold issue and that's why you're getting pressed on it. If it's a per se argument, then that's one thing and we'll talk about it. If it's not a per se argument, then we're talking about a range of choices. And then the question is a different question. So you can't say that's not the issue. That is the issue. You appear to have argued it was per se. The commonwealth called you on it and you replied, but you said that's not what we're saying. Here today, you've gone back and forth. Which is it? Is it a per se argument or is there a point at which a burden is so minimal that you can't say it's unconstitutional? Because if that's your point, then we've got a different discussion to have. The reason I am not using the word per se is that none of the cases that decide this issue have said that these requirements are per se unconstitutional. We don't care whether you simply use a word per se because whether it is a per se or a black line question impacts profoundly on how the district court should have decided this and ultimately what our review is going to be. Because if it's not a per se rule, then it seems to me the district court was in a position where it had to engage in some balancing, right? I'm not aware that there is any balancing and so perhaps this indicates that the case law establishes a per se rule. I have resisted using that terminology because none of the cases do. However, other than Zoutra, there is no case that says, well, the dilution of voting power in this case is minimal and therefore we're going to allow it. Instead, all the cases say whenever you have county based distribution requirements, what happens is you are diluting the power of voters in more populous counties and that is impermissible. What about Anderson-Celebrisi? What about the Berlitzges case? We talk about how the rigorousness of our inquiry into the propriety of the state election law depends on the extent to which a challenged regulation burdens the First and Fourteenth Amendment. That speaks in terms of extent. It doesn't speak in terms of per se. On the contrary, it seems to say there is a range. There is a point at which you'd look at this and you'd say it's minimal so we're not getting into it. That may be the case and Zoutra may be the rare example of a case where the dilution was found to be so minimal that the court in that case found it to be permissible. That again is a minority view that no other case has found the dilution of voting power to be so minimal as to be permissible under the Constitution. I'm raising it with you, Mr. Hollis, because it appears to talk about how we should look at the case almost standard of review. The rigorousness of our inquiry is how it was framed in Berlitzges. That is, we're going to give a sharper look at something where the extent of intrusion is higher. We'll give a less rigorous look if it's lower. If that is a range, like it seems to say, doesn't that affect not just how the district court approaches it, but how we have to approach it as we're reviewing it?  If there were a case where the dilution of voting rights was so minimal that it seemed to have no appreciable impact as the court found in Zoutra, that could be a case where the court would say, as applied, these requirements here are not in violation of more viability. The fact is, none of the cases except for Zoutra say that and certainly the burdens imposed in this case fall on the impermissibly burdensome side of the line. Should the district court have looked into what the burden was instead of simply creating an order that said the burden shall be less than so? Should we remand this to the district court to say, what is the burden? Is this really a serious burden or is it no appreciable effect? Judge Roth, I don't think that a remand is necessary here. The reason is that the case law is so overwhelmingly clear that unless there is a de minimis impact on voting rights, as in the Zoutra case, there is no support for the idea that this sort of requirement is permissible. And that's true even under the Anderson v. Celebrezzi analysis, Judge Jordan, that you were referring to. Blomquist v. Thompson and the Libertarian Party of Nebraska v. Bierman both apply the Anderson analysis to these sorts of requirements and they find that even under the Anderson flexible analysis, the burden on voting rights is significant enough to invalidate the distribution requirement. Well, that is the question, right? Feels like that's where the rabbit's going into the hat. You say the burden is significant enough. Without fact finding, we'd have to make the judgment about whether the burden was significant without any record on which to make that decision. That's why I think Judge Ross' question to you is a particularly pertinent one. Shouldn't there be a record? I mean, in fact, that seems to be one of your main complaints, is that this came ex cathedra. There was no there there. Why aren't you happy with or embracing the opportunity to go back and make the record to show this isn't de minimis? This is, in fact, the kind of burden that's unconstitutional. Well, Your Honor, we would certainly welcome that opportunity if given the opportunity. We don't think it's a necessary step in this case. We think that the case law is so overwhelmingly clear that unless there is de minimis burden and the evidence here is just compare it to all the other cases that we've cited in our briefs. This is not a de minimis burden. This is a burden involving hundreds of signatures in different counties. And that is equivalent to all the cases that have been held unconstitutional. Zout, again, being the very, very rare singular exception in which only ten signatures were required in ten different counties, that begins to approach a non-existent burden. And that's, I think, why that case is such an outlier. Will, did you reserve time for rebuttal? Well, I intended to reserve five minutes, Your Honor. I'm not sure if I was credited with that. I don't know. And we're not going to give you five minutes, but we'll give you two, even though you neglected it. Thank you, Your Honor. Ms. Tesoro. May it please the Court, I'm Claudia Tesoro from the Attorney General's Office on behalf of the Commonwealth. Ms. Tesoro, in this ongoing session of the General Assembly, has there been so far any effort to take up the legislative initiative that would provide some guidance here that died in the last session of the General Assembly? I checked the day before yesterday to find out if there had been any further developments on that particular legislation. And unfortunately, it looks like it was at the same point then that it was when we read the briefs. All right. Well, Judge Stengel, I think, relied upon the House version of the bill for some of the provisions in his decree. Has there been reintroduced the same version in the House? My understanding is that House Bill 342 was referred to rules. And that happened just at the time when Judge Stengel made his order. Approximately the same day or week. Except that was a year ago. Or I mean, that was in 2016, right? Late June, yes. Yeah, so we have a new General Assembly as of the beginning of, as of early January of this year. Of course. So the legislation would have died at the end of that session. I'm sure you know more about the legislative process than I do, and that's probably correct. I don't know, I asked Chief Counsel yesterday for the Department of State if there were any additional moves going on. And my understanding is no, not yet. So no additional moves, would that mean 342 hasn't been even reintroduced? There's nothing pending? I don't know. I don't really know. I don't want to say that absolutely, but I don't think so. I don't know that. Thank you. As it has already been pointed out, the aspiring parties are appealing just because of the one provision in this order that was designed to protect their declaratory judgment and the victory they'd already succeeded in obtaining and pending further legislative action. I can't hide from you the fact that the further legislative action, whatever it may be, hasn't happened yet. Isn't that problematic? Isn't it problematic that the way the district court framed the order was that this is going to be the rule going forward until there's legislative action? So finding nobody else but these people, they have this requirement, and that's going to be the requirement on them ad infinitum, with no record, no fact-finding by a legislative body, no fact-finding by the district court itself. How can that be a sound basis on which to make the judgment about ballot access, Ms. Sorrell? Well, at the time that the order was entered, of course, it was right when the bill was in the legislature, so I think that is one difference. I understand what you're saying about how going forward it could be an issue, but I do think that that order that might But we are forward. That's what I'm trying to get you to speak to. We're past the November 2016 election, and they're still under this obligation. Well, yes, but don't forget a couple of other details. In that order, the parts that the aspired parties are very satisfied with, the 2% signature requirement that they were subject to before is eliminated, and they only have to obtain There's no question that there's stuff they like, but they've made what seems to me a pretty darn persuasive point, which is you can't make us accept an unconstitutional requirement as the price for overturning other unconstitutional requirements. Now, granted, you don't accept that the county distribution is unconstitutional, but their claim isn't we don't like all the stuff we like. They do like it. They say you can't gloss over the problem by saying look at all the good stuff you got. That brings us back to the point that was discussed during Mr. Hall's argument, which is whether the requirement that's incorporated into that order is by definition unconstitutional, and we submit that it is not. It's actually comparable to what's been in effect for major parties since 1985. And they say that's unconstitutional, too, and the fact that no one's challenged it doesn't make it any more constitutional than it was before. So they're really asserting to the district court and to us, make the Commonwealth distinguish more. Make them address more head on. Well, one thing that hasn't been mentioned yet, but I think is very important, is that that analogous existing requirement has been challenged. In the Berg case in particular, both in federal court and in state court, and in that case the courts have or the federal court found no likelihood of success on the merits. The state court, including the Pennsylvania Supreme Court, did a fairly detailed analysis of Moore and of the statute that they were interpreting there and concluded that it was constitutional, notwithstanding Moore. They drew upon their own previous decision in Kavanaugh v. Schaeffer, which reached a similar conclusion about a similar provision in the Pennsylvania Code. I realize it's a- And Mr. Hall, I think, responded in his papers, those are the same courts that said the very things you've struck down Third Circuit as unconstitutional are constitutional. Those are the courts that said it's okay what was going on before. So we certainly have lots of respect for the state courts, but you shouldn't respect them in this regard. What's wrong with his reasoning? I think one thing that's wrong with his reasoning is that the relatively cursory finding of constitutionality in the Nader case was almost an afterthought, as I recall, and I admit I haven't looked at it just now. Whereas here, the state court decision is much more on target and thorough and entitled to some credence. In fact, I think what happened in the Berg litigation is that the appeal to this court ended up being dismissed for lack of jurisdiction because after the order denying a preliminary injunction is when the state courts completed their review at Commonwealth Court and the Pennsylvania Supreme Court. And although there is no available published decision based on the docket and the briefing and so on, it looks like Rooker-Feldman prevented this court from going any further in that instance. Do we have the problem that Judge Roth was posing to Mr. Hall, that there's not a record here? Doesn't the lack of any record or even any explanation for this requirement all by itself create a problem for the Commonwealth in defending the order? Well, not as much of one as Mr. Hall would suggest. What is the record then that exists here? The record is not a typical record with testimony and exhibits and so on. So what is it? There were some telephone conferences. There were telephone conferences and there were letter briefs and proposed orders exchanged, apparently. No declarations, no affidavits, no testimony, no factual information submitted that the court took cognizance of and made findings on, right? Well, it's my understanding that there was a certain amount of urgency because the upcoming election required everybody to get their ducks in a row. No question. And nothing in the questions that I'm asking, and I'm sure this is true for my colleagues, means any disrespect for Judge Stengel at all who was working under time pressures and trying to accommodate everybody's interests and do the best that could possibly be done to meet the needs of the parties in front of them under time pressure. But we're past that time pressure and so we're looking at the record for an order that is ongoing. And so I'm putting a question to you. There was no fact-finding at all and no record upon which fact-finding could take place. You said it was not a typical record. There's no even atypical fact record here, is there? There is no typical or atypical record, I guess you could say. There was just a series of conferences that happened after the Greenland. However, I don't think that's necessarily fatal because I think that we know certain things or can take judicial notice of certain things or can interpret the case law in certain ways to satisfy ourselves that not just because of the Berg litigation but because of the contours of the statute and the order that's based on the statute, it's okay. It's not unconstitutional. All right. So if we look at the figures of what's required under the district court's decision here and we look at more and we balance off the figures without any input, without any argument from you or Mr. Hall, are you happy with that or do you want some input into exactly what is required here as opposed to what was required in Moore? I think obviously if the court decides to remand, we'll develop more of a record if we have to. But I think what we have for the moment lost sight of is that the kind of flaws that were identified in Moore itself and in the several cases that the aspiring parties rely on are not the same as what we're faced with with Pennsylvania statutes. They're precisely the same, aren't they? It's a dilution of one man, one vote. That one person, one vote is the principle behind Moore. And they say, look, you said we could take judicial notice. If my numbers are right, the 2010 census shows that the top four largest counties in the state of Pennsylvania had 32.8% of the population and the top nine had over half, 51.8%. That means for the office of governor, a minority of the population can block the will of the majority. There's a minority of the population that's out there in the rest of those counties and they could theoretically, there's a set of circumstances under which they could block the ballot access for people that a majority of the people wanted to see on the ballot. That seems to be the kind of dilution and problem that Moore is exactly talking about, isn't it? The conversation earlier about the extent of the burden and so on has to be factored in here. And the scheme in Pennsylvania as a practical matter is much more flexible and forgiving without the threat of veto or dilution that was identified in Moore. How so? If you've got a county distribution requirement, and it's a quote requirement, unquote, how is that, you know, we can argue about how many signatures, how high that burden is, but as in the abstract, the fact that it exists, doesn't it exactly do what Moore was talking about? That is, dilute the vote of people in more populous counties. In a theoretical sense, and in per se sense, I understand what you're saying. But it's important, I think, that in the Pennsylvania setup, including in this order, there are 67 counties and signatures only have to be obtained for statewide office from five of them. And the candidates who are trying to obtain the right to run can pull the rest of their signatures from 62 or 57 other counties. Governor requires 10. So your assertion is not that Moore is in a posit, which is where you seem to be starting. Your assertion is that even under Moore, our burden is not too significant. Is that it? I guess that's what I'm saying. What I wanted to add, along those lines, is that some of the cases following Moore required that the proponent of candidacy gather signatures from half of the counties in the entire state, as opposed to 5 or 10 out of 67. And there were a couple of cases, one in Rhode Island, one in New York, if memory serves, where they had to get signatures from every county. Furthermore, some of the states... We're talking about the level of the burden, right? We're talking about, in other words, we're kind of back to whether this is a bad enough burden to say it's unconstitutional or not, and that's a kind of a judgment call on which you would think we would need some sort of developed record to know what the burden actually meant in practice or would mean in practice, and some exercise of judgment by the district court explained on the record that we could look at. Isn't that how this would usually work? There's nothing about this case that I would say is usual or typical. I understand what you're talking about, but I think we can reason from what's in the case law that the burden here is low, if there is one. The other example I wanted to give you before my time runs out is that several of the other states whose distribution requirements were examined in older cases had caps as far as the number of signatures that could come from any one county, and that is a factor that is totally not in this setup here in Pennsylvania. The dilution factor is much less of a threat when we have 12, 14 million people in the state with 67 counties and no one county or regional group dominates the commonwealth demographically the way it was true as I understand it with Chicago versus the rest of Illinois. It's a more dispersed population. Lots of urban centers that aren't as big as Pittsburgh and Philadelphia, but they're sprinkled all over the state. The interests of the people are not as divided. Thank you. Thank you.  Thank you, Your Honor. Just a couple of quick points here. First of all, I have to correct my colleague. They have said, the commonwealth has said both in their briefs and here today at oral argument, that these requirements are comparable to those that are imposed on major party candidates. That is incorrect. They are two and a half times more burdensome than the distribution requirements imposed on major party candidates. Secondly, the only federal court case that looked at this, Elliott v. Shop, invalidated the requirements that are imposed on major party candidates. What happened in the Berg case that was in the federal court? The Berg case was a decision on a motion for preliminary injunction, which was denied because the plaintiff had come very, it wasn't clear from the record whether the plaintiff had simply been careless. So Your Honor is correct to point out that there was one other federal court case. It was not a final decision on the merits. And as my colleague has pointed out, the appeal was dismissed on Rooker-Feldman grounds. But again, the only decision on the merits in a federal court was Elliott v. Shop, and that struck down these requirements as applied to the major party candidates that were challenging the requirements. So that's why in the current statutory structure, the requirements do not apply to major party candidates for president and senate. And that's why the court's order in this case also omits them for candidates for president and for senate. It's because they were struck down when they were previously challenged. Secondly, I would like to point out that there is already evidence in the record of which this court may take judicial notice as to the impact of these requirements. We cite in our briefs the population of Philadelphia County, which is 1.5 million residents. Those residents are not able to nominate candidates under this statutory scheme, whereas a fraction of that number of residents can in the less populous counties in Pennsylvania. That is precisely the impermissible impact that was found in Moore v. Fogelty and all the cases following it. Therefore, there is no need for remand here. There is a clear evidence of constitutional violation based on evidence of which this court may take judicial notice, and this order should be vacated insofar as it imposes those requirements. Thank you, Mr. Hall. Thank you to counsel. We'll take the matter under advisory.